**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION  II**

| | |
|---|---|
| JILLIAN CRABTREE, | No.  54951-4-II |
| Appellant, | |
| v. | PUBLISHED OPINION |
| JEFFERSON COUNTY PUBLIC HOSPITAL DISTRICT NO. 2 d/b/a JEFFERSON HEALTHCARE, | |
| Respondent. | |

WORSWICK, J. — Jillian Crabtree appeals the trial court's order granting summary judgment dismissing her claims of sex discrimination against her employer, Jefferson Healthcare.  Jefferson Healthcare fired Crabtree after she became pregnant.  On appeal, Crabtree argues that there is a genuine issue of material fact as to whether (1) Jefferson Healthcare's stated reasons for her termination were a pretext for discrimination, and (2) Jefferson Healthcare was substantially motivated by Crabtree's pregnancy when it made the decision to discharge her.

Because issues of material fact exist regarding both these issues, we reverse the order granting summary judgment and remand for further proceedings.

## FACTS

### I.  BACKGROUND ON CRABTREE'S POSITION

Crabtree started working at Jefferson Healthcare as the manager of patient access services in May 2018.  Crabtree's direct supervisor was Jennifer Goodwin, who was in turn supervised by Hilary Whittington.  Crabtree's job duties included overseeing three registration desks: one at the main entrance of the hospital, one at the emergency department, and another at the "walk-in"

clinic. Crabtree supervised up to 20 employees at a time and managed those employees' hours, schedules, and personnel issues. Crabtree's position required her to have working knowledge of the electronic medical record (EMR) system and an understanding of the financial counselors' role in order to assist her team should an issue arise.

Every other week, Crabtree had regular one-on-one meetings with Goodwin and Allison Crispen, a human resources (HR) "business partner," who was assigned to assist Crabtree in all HR and policy matters. Crabtree described the purpose of those meetings as an open conversation and an opportunity to receive advice and input.

## II. CRABTREE'S PERFORMANCE EVALUATION

About seven months after Crabtree started her position, she received her first performance evaluation on November 26, 2018. The evaluation included a self-assessment section, followed by the supervisor's assessment on a scale of 1-4, with 4 being the highest score.[1] The evaluation contained a total of 19 values, divided across four categories. The categories and values were as follows:

(1) "Organizational Values," included "Compassion, Respect, Teamwork, and Stewardship;"
(2) "Organizational Competencies," included "Professional Practices, Quality and Safety, Service, Effective Decision Making, Communication, Initiative, and Accountability;"
(3) "Position Standards" included "Overall Job Knowledge, Operations and Policy/Procedures, Productivity/Efficiency;" and,
(4) "Leadership Skills" included "Quality and Safety, People, Service, Community Health, and Sustainability."

CP at 580-83.

---

[1] "1" is defined as "does not meet expectations," "2" is defined as "needs improvement," "3" is defined as "meets expectations," and "4" is defined as "exceed expectations." CP at 580.

For category (1), Goodwin awarded Crabtree a "3," meaning that she met expectations for all the listed values. For category (2), Goodwin awarded Crabtree a "3" in all values, except for "effective decision making," to which she rated Crabtree a "2," meaning she needed improvement. Goodwin included written feedback for category (2). Her feedback stated:

> As we've discussed in our vision for the front end, this is one of your priorities and areas where you and the team can gain energy around this forward direction. Creating an environment where our team has actively thought [through] what our patients' needs are, prior to them presenting on their date of service, is where our operational planning should be.

CP at 581. Under category (3), Goodwin rated Crabtree's performance as a "2," needing improvement, on two of three values: "overall job knowledge" and "productivity and efficiency." Goodwin included written feedback for category (2):

> Patient Access scope is at the core of ensuring an accurate, efficient and streamlined revenue cycle stream. I encourage you to utilize both NAHAM information/ networking and HBI tools/best practice materials as great references for Patient Access knowledge and understanding.[2]

CP at 582.

In category (4), "Leadership Skills," Goodwin rated Crabtree's performance as a "3," meeting expectations, in all values, except for a value labeled as "people," for which Goodwin awarded Crabtree a "2," needing improvement. "People" is defined as:

> Actively works toward recruiting and retaining a high performing workforce; builds and maintains strong provider/dyad relationships. Achieves top quartile results in the employee engagement survey. Seeks out current and constructive feedback and able to respond/adapt to feedback given; holds self and peers accountable to the standards of the organization. Engages and develops team.

CP at 583. In the written feedback that followed, Goodwin expressed the following:

---

[2] "NAHAM" and "HBI" are not defined in the record on appeal.

[I]t often becomes a balancing act of listening and being available and ensuring that [your team] understand[s] there is structure in place to share their feedback in a professional and respectful manner. I think they are on a learning curve, as you are, with building trust with a new leader and "feeling out" what you will allow with their conduct. I've seen you get stronger over the last month of backing up your responses with both HR assistance and policy and procedures to show the context of your direction. Keep up this rhythm and partnership with HR as you continue to set structure and expectations for the team . . . The team will need to see that there is reasoning, structure and methodology behind the changes from their Leader.

CP at 584. At the end of the evaluation, Goodwin noted that Crabtree was doing "nice work," and that she was "impressed" with Crabtree's "professional self-reflection," which she noted was "admirable and a great leadership skill." CP at 586.

Goodwin also included a summary of areas where Crabtree could improve. The summary included: (1) improving Crabtree's understanding of registration and financial counseling and its impact on "overall revenue cycle steam," (2) exploring "what works for communication" with Crabtree's team, and (3) increasing visibility with the registration team and allowing for more in person discussions to "resolve issues in the moment." CP at 586. In total, Goodwin rated Crabtree as "meeting expectations" in 12 out of 16 categories.[3]

Following the evaluation, Whittington included a two-page letter to Crabtree, which was "highly unusual" for her to do. CP at 375. In the letter, Whittington told Crabtree that she had a "good first year" and that she had "done a nice job stepping into an entirely new career." CP at 588-89. She also offered additional feedback.

Regarding scheduling and staffing, Whittington was "excited" for Crabtree to "challenge" the status quo with scheduling and staffing. CP at 588. Whittington also asked

---

[3] In total, the evaluation has 19 values, but Goodwin only included a rating for 16 of those values.

whether there were other things Crabtree's team could do to help with staffing and scheduling as the traditional template was "not necessarily the best path." CP at 588.

Regarding financial counseling, Whittington expressed frustration that Crabtree had closed the financial counseling office during training. She said that she would like to treat such occurrences as "never" events. CP at 588.

Regarding "[d]oing work versus being a manager," Whittington advised Crabtree that she should work with Goodwin "to set the guardrails of how time is set to ensure [she] ha[s] enough time to both complete the 'work' and be around [her] team members." CP at 588. Because "[t]here are times when there are not enough hours in a work week," Whittington wrote that "these peaks may require creative scheduling or prioritizing." CP at 588.

Regarding information sharing, Whittington expressed that she would "love to see [Crabtree] focus on getting buy in from other leaders about why what the [registration] and [financial counseling] teams are doing is so awesome by spreading [Crabtree's] own (awesome) rumors." CP at 588.

Regarding decision-making, Whittington offered Crabtree an example of what she herself did during her first year working for Jefferson Healthcare. When struggling to make decisions, Whittington would "[fold] pieces of paper into two side-by-side halves and [write] 'how could this be awesome?' and 'what could go wrong?' on either sides, with the question [she] was considering in bold at the top." CP at 589.

Whittington also told Crabtree that she "can do a full SWOT analysis of the two main teams and figure out where [her] effort could drive the best results and improvements."[4] CP 589.

### III. CRABTREE ANNOUNCED HER PREGNANCY IN EARLY DECEMBER

Crabtree told Whittington that she was pregnant in December of 2018. Whittington responded by saying "Wow. Poor Jen. She's going to be without a whole staff this spring/summer."[5] CP at 162. Whittington's remark referenced another manager on Goodwin's team, Sidonie Straughn-Morse, who was also pregnant. Goodwin supervised four managers, including Straughn-Morse and Crabtree. Because one manager position was vacant at the time, Goodwin would have been left with only one manager if Straughn-Morse and Crabtree had taken maternity leave at the same time.

That same week, Crabtree informed Goodwin of her pregnancy. Goodwin congratulated her and asked if she would be taking leave, and Crabtree said she would. Goodwin then followed up by asking if Crabtree planned on coming back after her leave, and Crabtree responded "yes." CP at 166. Goodwin then asked if Crabtree was interested in returning to a lesser role, to which Crabtree responded "No. I like my job." CP at 168.

About a month later, in January 2019, Whittington made a comment at a staff meeting that the hospital will be short staffed for a while because both Crabtree and Straughn-Morse will be taking maternity leave in the spring and summer. In February 2019, Crabtree met with HR to discuss her options for taking maternity leave.

---

[4] A "SWOT analysis" is a business management practice whereby an organization or a unit thereof identifies its strengths, weaknesses, opportunities, and threats. CP at 449.

[5] "Jen" referred to Goodwin.

IV. CRABTREE IS PLACED ON A PERFORMANCE IMPROVEMENT PLAN

A day after Crabtree's meeting with HR, Goodwin met with Crabtree to notify her that she was placing Crabtree on a 30-day performance improvement plan (PIP).

Goodwin said that HR, Whittington, and other members in leadership, supported her decision to place Crabtree on a PIP. Goodwin said that she noticed "large gaps" in Crabtree's success and other "significant performance issues." CP at 594. Goodwin included examples of what led her to believe that Crabtree would not be successful in her role: (1) Closing central registration for training without considering the impact on hospital operations; (2) Failure to identify one employee's non-compliance with the mask mandate sooner; and (3) Inability to manage people or make decisions in day-to-day operations. Goodwin also stated that she did not "feel confident that [Crabtree] will be successful in filling the gaps within the 30 days." CP at 594. When Crabtree stated her belief that PIPs were meant to set people up for failure, Goodwin told her that was not her intent but re-affirmed that "it would be a lot of work to fill gaps within 30 days." CP at 594. Goodwin also suggested that Crabtree should look for other jobs, but Crabtree chose to continue with the PIP.

After the meeting, Goodwin created a PIP and presented it to Crabtree on February 19, 2019. The PIP included three goals. The first goal was to create a SWOT analysis and develop a registration staffing plan. To accomplish the first goal, Crabtree had to learn Epic, a software program that Jefferson Healthcare used to manage the EMR system. She also had to define "productivity expectations" for the financial counselors; create staff schedules with reasons why each staff member was on a particular shift, including a breakdown of hours, expectations, and

7

other requirements; and she had to meet with her team and explain her reasoning behind the schedule. CP at 597-98.

The second goal was to create an impact analysis. To complete this goal, Crabtree was required to use documented spreadsheets detailing how patient access interacts with other departments. The third and last goal instructed Crabtree to define "gaps and opportunities," "develop action plans," "define how to identify indicators to react to," and "define how to measure and how work will continue." CP at 598. To accomplish this goal, Crabtree was expected to structure her time to allow for more time at the registration desk, re-institute staff meetings, "huddles," and focus meetings. CP at 598.

The PIP had four "checkpoint" dates when Goodwin and Crabtree would meet to check in on Crabtree's progress. CP 599-600. Each meeting was scheduled a week apart on February 26, March 5, March 12, and March 19. After their March 5 meeting, Goodwin emailed Crabtree that she was "doing well with [her] proactive work for all of the above," referring to the PIP goals, and that what Goodwin was "hearing and seeing is the right thing." CP at 708.

The PIP had a completion date of March 20. Crabtree was concerned about whether she could complete the PIP by the deadline, but Goodwin told her that a good faith effort to comply with the PIP would be enough.

By March 12, Crabtree had not completed any of the goals listed in the PIP, but she was working toward accomplishing them. For example, Crabtree sought out and received training on Epic by meeting with a team member from clinical informatics at least two or three times. For the SWOT analysis, Crabtree was working on gathering information by looking through reports and other materials available on Epic. For the registration staffing plan, Crabtree went from

using an Excel spreadsheet for scheduling to a new program called "Kronos" that offered the team better visibility and flexibility with scheduling. CP at 294. She was also working on redistributing shifts to better correlate with patient volume. To do that, she was gathering data to quantify "how many registrars [Jefferson Healthcare] would need based on how many patients were coming through." CP at 204.

Crabtree's efforts on the registration staffing plan were put on pause when Jefferson Healthcare decided to redefine the duties of the registration staff, which would have significantly affected the way Crabtree scheduled her staff. In addition, Crabtree scheduled a meeting with Christine Curtis for additional data, but Curtis could not meet until "late next week." CP at 708. Crabtree notified Goodwin of the possible delay in completing the registration staffing plan around March 7, and Goodwin noted that "continuous forward progress is ok for this one—the data you need and the timeline appears to be outside of your control. Glad you connected with Christine for this data." CP at 708; Br. of Appellant (Appendix A).

## V. CRABTREE'S TERMINATION

On March 15, before the PIP ended, Jefferson Healthcare terminated Crabtree. Even though Crabtree's termination occurred before the PIP's end date, Crispen reasoned that it became "abundantly clear that [Crabtree] would not be able to complete or make significant progress on her [PIP]."[6] CP at 501. Crabtree's termination was finalized in writing on March 18. The decision to terminate Crabtree was in part made by Whittington and Crispen, both

---

[6] Crispen testified in her capacity as a CR 30(b)(6) representative for Jefferson. CP at 373. CR 30(b)(6) allows an organization to designate "persons [to] . . . testify as to the matters known or reasonably available to the organization."

whom were pregnant at the time of the decision. Crabtree's termination letter stated the following reasons for her termination:

> After our meeting on 3/12/2019 it was evident to me that the work it would take to be successful in your PIP by 3/20/2019 was not close to being completed. As of 3/12/2019 the following had been started and not completed or not started at all
> - Learning the Epic modules that Registration and Financial Counseling utilize.
> - Creating a SWOT analysis of what effort/work is needed to be done to drive Registration and Financial Counseling [Account Receivable] improvement had not been started.
> - Registration Staffing Plan/Schedule that incorporates logic/reasoning to patient flow/volumes had not been started. You stated that you had a meeting to look at data on 3/14/2019.
> - Creating a spreadsheet to show how Patient Access partners and impacts other departments/clinics at Jefferson [Healthcare] had not been started.

CP at 605-06. The letter then articulated details of Crabtree's performance on the PIP. For example, the letter stated that Crabtree was spending "5 hours on Epic training," but Goodwin's expectation was for Crabtree to spend time learning Epic in addition to her daily work, and that Epic training "though a part of the 30-day PIP, should have been completed well before the necessity arose for the PIP." CP at 606.

## VI. STRAUGHN-MORSE

Straughn-Morse was the other manager on Goodwin's team who was pregnant at the same time as Crabtree. In February 2019, Straughn-Morse was advised that, in addition to supervising her team, she would need to take on the supervision of the billing team as well. Before Goodwin approached Straughn-Morse about the new duties of her position, Crispen emailed Goodwin the following advice:

> If [Straughn-Morse] pushes back, just let her know this isn't an optional piece, this is how the new structure is going to be moving forward because it makes the most sense for that position. If she then asks for more money, it is not the practice of [Jefferson Healthcare] to give more money for these things.

CP at 713. Straughn-Morse declined to take on additional duties, and she stepped into a lesser role with a corresponding reduction in pay and responsibilities. It is unclear if Jefferson Healthcare demoted Straughn-Morse or if she elected to step into the lesser role. Straughn-Morse took maternity leave in April and returned to work in the lesser role in September.

## VII. PROCEDURAL HISTORY

Crabtree filed a lawsuit against Jefferson Healthcare alleging that Jefferson Healthcare terminated her because of her pregnancy in violation of the Washington Law Against Discrimination (WLAD). After discovery, Jefferson Healthcare moved for summary judgment, which the trial court granted.

Crabtree appeals the trial court's order granting summary judgment dismissing her claims of sex discrimination against Jefferson Healthcare.

## ANALYSIS

### I. STANDARD OF REVIEW

We review dismissals on summary judgment de novo. *Frausto v. Yakima HMA, LLC*, 188 Wn.2d 227, 231, 393 P.3d 776 (2017). We review all evidence and reasonable inferences in the light most favorable to the nonmoving party, here, Crabtree. *Keck v. Collins*, 184 Wn.2d 358, 368, 357 P.3d 1080 (2015). We affirm an order granting summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Keck*, 184 Wn.2d at 370. A motion for summary judgment must be denied if the nonmoving party, Crabtree, shows specific facts that show a genuine issue of material fact. *Zonnebloem, LLC v. Blue Bay Holdings, LLC*, 200 Wn. App. 178, 183, 401 P.3d 468 (2017). A genuine issue of fact exists when reasonable minds could disagree on the facts controlling the

outcome of the case. *Sutton v. Tacoma Sch. Dist. No. 10*, 180 Wn. App. 859, 864-65, 324 P.3d 763 (2014).

## II. DISCRIMINATION CLAIM

The WLAD bars employers from discharging an employee because of certain characteristics, including sex. RCW 49.60.180(2). The ban on discrimination on the basis of sex includes discrimination on the basis of pregnancy. WAC 162-30-020. A violation of RCW 49.60.180(2) supports a discriminatory discharge claim. *See Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County*, 189 Wn.2d 516, 526, 404 P.3d 464 (2017).

A. *Burden Shifting Framework*

Because direct evidence of discriminatory intent is rare, an employee "may rely on circumstantial, indirect, and inferential evidence to establish discriminatory action." *Mikkelsen*, 189 Wn.2d at 526. Where the employee lacks direct evidence, Washington has adopted the three step evidentiary burden shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) for discriminatory discharge claims. *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 445-46, 334 P.3d 541 (2014).

First, an employee must make a prima facie case of discriminatory discharge by showing that she was (1) within a statutorily protected class, (2) discharged by the defendant, and (3) doing satisfactory work. *Mikkelsen*, 189 Wn.2d at 527. Where the employee establishes a prima facie case, a rebuttable presumption of discrimination exists. *Mikkelsen*, 189 Wn.2d at 527.

Second, the burden shifts to the employer, who must "'articulate a legitimate, nondiscriminatory reason'" for the discharge. *Mikkelsen*, 189 Wn.2d at 527 (quoting *Scrivener*, 181 Wn.2d at 446). The employer is not required to persuade the court that it actually was

motivated by the nondiscriminatory reason, the employer need only show that the employer's evidence, if taken as true would permit the conclusion that there was a nondiscriminatory reason. *Mikkelsen*, 189 Wn.2d at 533.

Third, if the employer meets this burden, the employee must produce sufficient evidence showing that the employer's alleged nondiscriminatory reason for the discharge was a pretext. *Mikkelsen*, 189 Wn.2d at 527. "'An employee may satisfy the pretext prong by offering sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is pretextual or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer.'" *Mikkelsen*, 189 Wn.2d at 527 (quoting *Scrivener*, 181 Wn.2d at 446-47). The employee is not required to show that discrimination was the only motivating factor for the discharge because an employer's decision may be based on both legitimate and illegitimate reasons. *Mikkelsen*, 189 Wn.2d at 534.

Summary judgment for an employer is rarely appropriate in a discriminatory discharge case "because of the difficulty of proving discriminatory motivation." *Mikkelsen*, 189 Wn.2d at 527. "'When the record contains reasonable but competing inferences of both discrimination and nondiscrimination, the trier of fact must determine the true motivation.'" *Mikkelsen*, 189 Wn.2d at 528 (quoting *Scrivener*, 181 Wn.2d at 445). To avoid summary judgment, the employee must "show only that a reasonable jury could find that discrimination was a substantial factor in the employer's adverse employment action." *Mikkelsen*, 189 Wn.2d at 528.

The parties agree, for the purpose of summary judgment, that steps one and two of the burden shifting framework are met. Therefore, we analyze only the third step—whether Jefferson Healthcare's alleged nondiscriminatory reason for the discharge was a pretext.

B.      *Sufficient Evidence of Pretext and Discrimination as Motivating Factor to Survive Summary Judgment*

        1.  *Evidence of Pretext*

Crabtree argues that there is a genuine issue of material fact as to whether Jefferson Healthcare's stated reasons for terminating her were pretext for discrimination. We agree.

In this step of the burden shifting framework, the employee, Crabtree, bears the burden of showing sufficient facts supporting pretext to survive summary judgment. *Scrivener*, 181 Wn.2d at 441. "Employees may satisfy the pretext prong of the [burden shifting] framework by offering sufficient evidence to create a genuine issue of material fact . . . that the employer's articulated reason for its action is pretextual." *Scrivener*, 181 Wn.2d at 441. The ways in which an employee can show that a stated reason for termination was pretext for discrimination include, but are not limited to, "'that the reason has no basis in fact, it was not really a motivating factor for the decision [or] it lacks a temporal connection to the decision or was not a motivating factor in employment decisions for other employees in the same circumstances.'" *Scrivener*, 181 Wn.2d at 447-48 (quoting *Kuyper v. Dep't of Wildlife*, 79 Wn. App. 732, 738-39, 904 P.2d 793 (1995)).

"An employee does not *need* to disprove each of the employer's articulated reasons to satisfy the pretext burden of production." *Scrivener*, 181 Wn.2d at 447. Nor does an employee need to prove that discrimination was the only motivating factor in her termination. *Scrivener*, 181 Wn.2d at 447. "An employer may be motivated by multiple purposes, both legitimate and illegitimate, when making employment decisions and still be liable under the WLAD." *Scrivener*, 181 Wn.2d at 447. Circumstantial, indirect, and inferential evidence is sufficient to discharge the plaintiff's burden. *Mikkelsen*, 189 Wn.2d at 526.

"If a plaintiff produces evidence at this [] stage to counter the employer's reasons, the case must be submitted to the jury; if not, the employer is entitled to a dismissal." *Chen v. State*, 86 Wn. App. 183, 190, 937 P.2d 612 (1997). To overcome an employer's summary judgment motion, the employee must do more than express an opinion or make conclusory statements. *Chen*, 86 Wn. App. at 190. Instead, the facts must be specific and material. *Chen*, 86 Wn. App. at 190. An employee's assertion of good performance to contradict the employer's assertion of poor performance does not give rise to a reasonable inference of discrimination. *Chen*, 86 Wn. App. at 191. The question is whether the alleged violations were the actual reason for her termination. *Mackey v. Home Depot USA, Inc.*, 12 Wn. App. 2d 557, 582, 459 P.3d 371, *review denied,* 195 Wn.2d 1031, 468 P.3d 616 (2020).

Here, Jefferson Healthcare relied on evidence of Crabtree's PIP and November evaluation as the reason for her termination. However, Crabtree rebuts that evidence by showing that Goodwin informed her that a good faith effort to comply with the PIP was enough and that Goodwin had been giving her positive feedback. More than half way through the PIP and following Crabtree's second to last checkpoint meeting on March 5, Goodwin told Crabtree that she was "doing well" on all of her goals on the PIP.

In Crabtree's termination letter, Goodwin claimed that she terminated Crabtree because she failed to complete or start her PIP goals. However, Crabtree introduced evidence to show that the reasons in the termination letter are not based in fact. For example, in the termination letter, Goodwin wrote that the registration staffing plan "had not been started." CP at 606. However, Crabtree had already completed steps towards achieving that goal. Her work on that goal was put on pause because Jefferson Healthcare was imposing new duties on the registration

staff, so Crabtree had to stop working because the change directly affected her ability to implement a new registration staffing plan because it "significantly change[d] how many . . . interactions the registrants have." CP at 206.

In addition, the termination letter stated that Crabtree had not started on a SWOT analysis or an impact analysis, but Crabtree testified that she was gathering the information necessary for the SWOT and impact analysis, a necessary step. These facts are more than just an employee's assertion that her performance was good. These positive messages during the PIP process undermine Jefferson Healthcare's assertions about its reasons for terminating Crabtree.

Viewing the evidence and inferences in the light most favorable to Crabtree, Crabtree met her burden of producing sufficient evidence to show that a genuine issue of material fact exists as to whether Jefferson Healthcare's stated reasons for terminating Crabtree were pretext for discrimination.

Jefferson Healthcare argues that Crabtree was not actually making progress on the registration plan because she "was no closer to actually drafting a Registration Staffing Plan," and had only been reviewing data. Br. of Resp't at 30. And, it argues that Goodwin told Crabtree to continue working on the registration staffing plan despite the new duties being imposed on the registration staff. However, the PIP did not require Crabtree to "draft" a staffing plan or an impact analysis. It simply required her to learn Epic, define productivity expectations, and schedule staff meetings. A jury could reasonably conclude that Crabtree had, in fact, started working toward her PIP goals.

16

Therefore, we hold that Crabtree produced sufficient evidence to create a genuine issue of material fact as to whether the reasons provided by Jefferson Healthcare were pretext for discrimination.

2. *Evidence of Discrimination as a Motivating Factor*

Crabtree alternatively argues that she presented sufficient evidence to create a genuine issue of material fact as to whether Jefferson Healthcare was substantially motivated to terminate Crabtree because of her pregnancy. We agree.

Crabtree can alternatively meet her burden to show pretext by showing that discrimination was a substantial motivating factor for her termination. *Mikkelsen*, 189 Wn.2d at 527. To survive summary judgment, the employee need only present evidence sufficient to create a genuine issue of material fact as to whether "discrimination was a substantial factor in an adverse employment action, not the *only* motivating factor." *Mikkelsen*, 189 Wn.2d at 534. In an employment discrimination context, our Supreme Court has recognized that "evidence of employer treatment of other employees" is permissible to show "motive or intent for harassment or discharge." *Brundridge v. Fluor Fed. Servs., Inc.*, 164 Wn.2d 432, 445, 191 P.3d 879 (2008). Where there are "'reasonable but competing inferences of both discrimination and nondiscrimination, it is the jury's task to choose between such inferences'—not the court's." *Mikkelsen*, 189 Wn.2d at 536 (quoting *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 186, 23 P.3d 440 (2001)) (internal quotations omitted).

Goodwin was supervising four managerial positions, one of which was vacant when Crabtree announced her pregnancy. Of the three managers, Crabtree and Straughn-Morse were pregnant at the same time. If both managers were to take maternity leave at the same time,

17

Goodwin would have been left with only one manager for the spring and summer. Only a few weeks before Goodwin placed Crabtree on a PIP, Goodwin evaluated Crabtree as "meeting expectations" in most categories. When Whittington learned of Crabtree's pregnancy, she remarked "Wow. Poor Jen. She's going to be without a whole staff this spring/summer." CP at 162. Likewise, when Crabtree told Goodwin that she was pregnant, Goodwin asked if Crabtree would be taking leave, and Crabtree said she would. Goodwin then followed up by asking if Crabtree planned on coming back after her leave, and Crabtree responded "yes." CP at 166. Goodwin then asked if Crabtree was interested in returning to a lesser role, to which Crabtree responded "No. I like my job." CP at 168.

During a staff meeting, Whittington noted that Crabtree and Straughn-Morse were pregnant and that Jefferson Healthcare expected to be short-staffed for the spring and summer. In addition to those remarks, Crabtree was placed on a PIP only a day after she discussed maternity leave with HR. Goodwin then expressed her lack of confidence in Crabtree's ability to complete the PIP, and she urged Crabtree to consider lesser roles. Crabtree chose to continue in her role and was terminated before the PIP period ended.

At the same time that Crabtree was placed on a PIP, Straughn-Morse, the other pregnant manager, assumed a lesser role. After Straughn-Morse became pregnant, Goodwin gave Straughn-Morse the responsibility of managing an additional team with no additional pay, and she informed her that the added responsibility was not optional if she wanted to continue in her role. Straughn-Morse then started at a lesser role with a corresponding reduction in pay and went on maternity leave shortly after. Importantly, both pregnant women on Goodwin's team lost their managerial roles after becoming pregnant.

18

Viewing the evidence and inferences in Crabtree's favor, we hold that she presented sufficient evidence to show that a genuine issue of material fact exists as to whether Crabtree's pregnancy was a substantially motivating factor for Jefferson Healthcare to terminate her.

Jefferson Healthcare argues that the comments made by Whittington and Goodwin in response to Crabtree's pregnancy are not sufficient evidence to show a genuine issue of material fact because they do not show an intent to discriminate. In *Scivener*, the Supreme Court held that Scrivener presented sufficient evidence to create a genuine issue of material fact about whether her age was a substantial factor in her termination. *Scrivener*, 181 Wn.2d at 448. Scrivener presented evidence of comments from the president noting the "glaring need for diversity" and "need for younger talent." *Scrivener*, 181 Wn.2d at 449. Even though the *Scrivener* court considered additional circumstances, it noted "[w]hether or not these statements alone would be sufficient to show either pretext or that Scrivener's age was a substantially motivating factor, they are circumstantial evidence probative of discriminatory intent." *Scrivener*, 181 Wn.2d at 450.

Next, Jefferson Healthcare cites to *Mikkelsen* to support its position that "stray remarks" are not enough to create a genuine issue of material fact. Br. of Resp't at 35-39. In *Mikkelsen*, the court affirmed dismissal on summary judgment of Mikkelsen's age discrimination claim. *Mikkelsen*, 189 Wn.2d at 475. Mikkelsen presented only two pieces of evidence in support of her age claim: the general manager called her "old and stale" once, and that the general manager had a "fixation" on a 72-year old employee. *Mikkelsen*, 189 Wn.2d at 475. Our Supreme Court held that Mikkelsen presented "no evidence [that] the [general manager] treated older employees

differently." *Mikkelsen*, 189 Wn.2d at 475. Therefore, it affirmed summary judgment dismissal of Mikkelsen's age discrimination claim. *Mikkelsen*, 189 Wn.2d at 475.

Jefferson Healthcare argues that the stray remarks alone would not have been sufficient to establish a genuine issue of material fact, and that the court considered additional circumstances in *Scrivener* not present here. However, *Scrivener* made clear that stray remarks can be considered in determining whether the evidence in its entirety creates a genuine issue of material fact, and Crabtree does not rely solely on manager remarks. *Scrivener*, 181 Wn.2d at 450 ("The Court of Appeals disregarded [the] statements . . . as stray remarks that do not give rise to an inference of discriminatory intent . . . We disagree."). Therefore, *Scrivener* actually supports Crabtree's position.

Unlike the age discrimination evidence in *Mikkelsen*, Crabtree presented more evidence than just the remarks made by Whittington and Goodwin. She presented evidence of another employee, Straughn-Morse, giving up her managerial position shortly before going on maternity leave. Crabtree also introduced evidence of a potential motive behind why Straughn-Morse was moved to a lesser role and why she herself was placed on a PIP a day after discussing maternity leave with HR. As evidenced by Goodwin and Whittington's remarks, the vacancy on Goodwin's team was a concern for Jefferson Healthcare.

When Crabtree informed Whittington of her pregnancy, Whittington expressed concern for how Goodwin was going to handle two of her managers taking maternity leave. In addition, when Crabtree informed Goodwin of her pregnancy, Goodwin asked if Crabtree was going to take leave and whether she was interested in a lesser role. Moreover, the reasons for Crabtree's termination as listed in her termination letter did not accurately reflect Crabtree's PIP progress.

Also, the PIP came only a few weeks after Goodwin had evaluated Crabtree's performance as meeting expectations in most categories. Therefore, the facts surrounding Mikkelson's age discrimination claim are distinguishable from the facts in this case.

Jefferson Healthcare also argues that the evidence of Straughn-Morse's new position is irrelevant and therefore inadmissible. It cites to *Brundridge*, where the court held that even if evidence is probative of discriminatory intent, it will not be admissible if its value is outweighed by prejudice. *Brundridge*, 164 Wn.2d at 445. In that case, the plaintiffs alleged discriminatory discharge based on retaliation for refusing to install unsafe safety valves. *Brundridge*, 164 Wn.2d at 445. They introduced testimony of another employee who spoke about incidents of dangerous gases and how management downplayed those incidents. *Brundridge*, 164 Wn.2d at 445. The court did not admit that portion of the testimony because the company did not take adverse action against the employee who reported the incidents, and thus, the testimony was irrelevant to a retaliatory discharge claim. *Brundridge*, 164 Wn.2d at 445. However, the *Brundridge* court admitted evidence of retaliation against other employees to show motive because it found it to be relevant. *Brundridge*, 164 Wn.2d at 445.

Like the admissible testimony about retaliation against employees in *Brundridge*, the circumstances surrounding Straughn-Morse's change in position are relevant because they tend to show that the only other pregnant manager under Goodwin's supervision had to take a lower paying position around the same time. Both of the pregnant women on Goodwin's team could not maintain their managerial roles after they announced their pregnancy. Therefore, we consider the Straughn-Morse evidence to be relevant to the issue of sex discrimination.

Finally, Jefferson Healthcare argues that Straughn-Morse's decision to move to a lesser role was voluntary because she did not indicate that Jefferson Healthcare pressured or threatened her to take adverse action against her if she did not accept the position. However, when reviewing an order granting summary judgment, we view all evidence and inferences in the light most favorable to the nonmoving party. Here, there are two inferences that could be made from Straughn-Morse's position change. The first inference is that she accepted the position voluntarily without any pressure from Jefferson Healthcare—such an inference would be a non-discriminatory inference. Another inference could be that in the conversation Straughn-Morse had with Goodwin, she felt that she had no choice but to accept a lesser role in order to keep her job—such an inference would be a discriminatory inference. There are two rational and competing inferences, and we must view the inferences and evidence in the light most favorable to Crabtree.

Thus, viewing the facts and inferences in the light most favorable to Crabtree, Crabtree presented sufficient evidence to show that a genuine issue of material fact exists as to whether her pregnancy was a substantially motivating factor in her termination from Jefferson Healthcare.

## CONCLUSION

Crabtree produced sufficient evidence to create a genuine issue of material fact as to whether (1) Jefferson Healthcare's stated reasons for her termination were pretext for discrimination, and (2) Crabtree's pregnancy was a substantially motivating factor for her termination from Jefferson Healthcare.

No. 54951-4-II

Because genuine issues of material fact exist, the trial court erred in granting Jefferson

Healthcare's motion for summary judgment. Consequently, we reverse the order granting

summary judgment, and remand for further proceedings.

Worswick, J.

We concur:

Glasgow, A.C.J.

Cruser, J.